Filed 5/20/22  P. v. Alcaraz CA4/3

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>USIEL ALCARAZ et al.,<br><br>  Defendants and Appellants. | G057009<br><br>(Super. Ct. No. 12NF1202)<br><br>ORDER MODIFYING<br>OPINION AND DENYING<br>PETITION FOR REHEARING;<br>NO CHANGE IN JUDGMENT |

Upon considering appellant Diaz-Guerreros' petition for rehearing, the opinion filed on May 5, 2022, is hereby ordered modified as follows:

1.  On page 36, after the final sentence before the Disposition, the following text is added:  "On remand, the trial court shall consider whether there is sufficient evidence to support the gang charges after allowing the parties to fully brief that issue with the benefit of recent decisional authority pertaining to AB 333.  (See *People v. Pineda* (2021) 66 Cal.App.5th 792, 801-802, review granted Sept. 29, 2021, S270513 [remanding for consideration of sufficiency-of-the-evidence claim on unsettled legal issue even though the full record of conviction was before the appellate court].)"

This modification does not effect a change in the judgment.

Appellant's petition for rehearing is DENIED.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. USIEL ALCARAZ, et al., Defendants and Appellants. | G057009 (Super. Ct. No. 12NF1202) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, David A. Hoffer, Judge.  Affirmed in part, reversed in part and remanded.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant Andres Felipe Diaz-Guerrero.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Idan Ivri, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Andres Felipe Diaz-Guerrero and his codefendant Usiel Alcaraz were convicted of attempted murder and other crimes for shooting a man they were

attempting to rob.  Alcaraz was convicted as the shooter, and appellant was convicted under aiding and abetting principles.  After we affirmed their judgments on appeal (*People v. Alcaraz et al.* (Apr. 7, 2020, G057009) [nonpub. opn.]), the California Supreme Court denied Alcaraz's petition for review, and a partial remittitur was issued as to him on July 9, 2020.  However, the Supreme Court granted appellant's petition for review and transferred the matter back to us with directions to vacate our decision and reconsider his case in light of Senate Bill No. 775 (Stats. 2021, ch. 551) (SB 775), which became effective on January 1, 2022.

In accordance with those directions, we vacate our prior decision as to appellant.  We also agree with the parties that appellant's conviction for attempted murder must be reversed pursuant to SB 775, and the matter must be remanded for further proceedings with respect to that charge.  But we adhere to our previous analysis on the other claims appellant raised in his original appeal, and we decline his invitation to consider a new claim that is outside the scope of the Supreme Court's transfer order.  Accordingly, other than to reverse appellant's attempted murder conviction, we affirm the judgment in all respects.

FACTS

*Prosecution Case*

John Doe 1 (JD1) and John Doe 2 (JD2) were walking together one night to a 7-Eleven store in Anaheim.  A black SUV drove up.  JD1 saw four people inside the SUV.[1]  The driver asked them, "Do you guys bang?"  JD1 and JD2 responded, "No, we don't."  A passenger asked, "Where you from?"  At least one of the occupants yelled, "Anaheim Travelers City," and the SUV drove away.

JD1 watched the SUV pull into the 7-Eleven parking lot.  JD1 and JD2 walked into the store, where a surveillance camera recorded them entering.  Once inside,

---

[1]    Four persons were initially charged together in this case, but appellant and Alcaraz were tried separately.  The other two defendants' cases are not before us.

JD1 saw the same people who had spoken to him from the SUV. Some of them stood behind him while he used a store ATM to withdraw cash, which he placed in his pocket. JD1 identified one of them as appellant. Appellant whispered something inaudible. JD1 asked him, "What was that?" Appellant again whispered something that JD1 did not comprehend. The SUV driver left the 7-Eleven and began pacing outside. Seeing this, JD1 got a "bad feeling" and became nervous and fearful. As he left the 7-Eleven, someone spat at his shoe.

JD1 and JD2 walked back the way they had come, and they were followed by appellant and Alcaraz. Both approached JD1, and when they were within five feet, appellant said, "Travelers City. We don't fuck around." Alcaraz pulled out a gun, pointed it at JD1's chest from a foot or so away, and said, "Give me everything you have." JD1 put his hands up and said, "I don't have anything." Alcaraz patted JD1's pockets and felt a phone, which he demanded. Instead, JD1 punched Alcaraz in the jaw.

Alcaraz immediately responded by opening fire. His first shot grazed the skull of JD1, who then turned and ran. Alcaraz "continued to fire," and JD1 was hit in the back by another gunshot and fell. This too was captured by surveillance video. JD2 said he heard three or four gunshots and saw JD1 running, get hit and fall down. A semiconscious JD1 told JD2 to call police. Alcaraz and appellant fled. A nearby witness saw two persons running and get into a black SUV, which then sped away.

The parties stipulated JD1 suffered a grazing gunshot wound to the top of his head and another gunshot wound to the back. The latter bullet fragmented into his vertebrae, permanently paralyzing him from the waist down.

Later that night, gang investigator Daniel Gonzalez staked out a house known to be associated with the Anaheim Travelers City gang. A black SUV matching the one seen at the 7-Eleven drove away from the house and was stopped by police. The driver, codefendant Anthony Manzo, was detained. Gonzalez reviewed surveillance footage from the 7-Eleven and confirmed Manzo was also the SUV driver there.

3

Gonzalez and other officers returned to the house and secured it while obtaining a search warrant. Alcaraz and a fourth defendant were found inside the house, and appellant in the garage. Also in the garage was a Milwaukee Brewers baseball cap and a work ID with the name Diaz. Inside the house, there was another Brewers cap and a bulletproof vest.

Gang investigators Jeff Dodd and Ryan Blackburn interviewed JD1 at the hospital. Dodd showed JD1 photographs of possible suspects. JD1 identified two persons from the first set of photographs. He said one was the driver of the SUV who had asked, "Do you bang?" He was also the one who had said "Anaheim Travelers City" before driving away. The other, who JD1 identified at trial as appellant, was the same person who had accosted him while he was using the ATM inside the 7-Eleven and had asked him, "Am I big enough for you?" From a second set of photographs, JD1 again identified appellant. He added appellant was the man who confronted him after he left the 7-Eleven and had said, "This [is] Travelers City, we don't play, we don't mess around." In a third set of photographs, JD1 identified Alcaraz as his shooter. He also later identified him at trial. JD1's hospital description of the incident to police was generally consistent with his later trial testimony.

Appellant initially said he was not present at the 7-Eleven on the night of the incident, but when shown photos from the surveillance video, he changed his story and admitted he was one of the people depicted in the images. He denied any gang affiliation but said his father was a member of Anaheim Travelers City. Alcaraz admitted being present at the 7-Eleven that night, and identified himself in video surveillance stills, but he denied shooting anybody and said he did not touch a gun.

Gang detective Jamie Pietras served a search warrant on a house associated with SUV driver Anthony Manzo. A seized digital camera contained a shot of Manzo wearing a hat with insignia associated with Anaheim Travelers City. A cell phone photo

4

showed Manzo making a hand sign associated with the gang. Pietras also found a box of ammunition and various indicia of the Anaheim Travelers City gang.

The parties stipulated Anaheim Travelers City, also known as "Los Malos," is a criminal street gang as defined in Penal Code section 186.22, subdivision (f), with territorial claims in Anaheim, including the location of the 7-Eleven.[2] As "Los Malos," Anaheim Travelers City members often identified themselves by wearing clothing displaying the letter "M," including Milwaukee Brewers baseball caps. The parties further stipulated the gang's primary activities include illegal weapons possession, robbery and aggravated assault. Members of the gang had committed statutorily qualifying predicate crimes, including their primary activities.

Pietras also testified as a gang expert.[3] He told the jury gang members are proud of their membership and non-members do not falsely claim to be gang members because doing so could lead to gang retaliation. Respect is important in gang culture, and members earn respect by committing acts of violence. Hispanic gangs tend to claim a distinct territory and mark borders, so the community and rival gangs are aware of them.

A "hit-up" occurs when gang members confront a rival or perceived rival and ask where they are from. Most often, there is no correct answer, and the likely result is violence. Even if the targeted individual is not a gang member, the gang members hitting him up will still benefit from committing a violent act against him because it increases the fear and intimidation the gang causes in the community. Gang members commit group assaults, robberies and shootings as a show of force, to back each other up, and to outnumber and intimidate their victims.

---

[2] Unless noted otherwise, all further statutory references are the Penal Code.

[3] In his briefing, appellant characterizes Pietras as a "tool." Whether this description is ad hominem or utilitarian does not matter because he did not object at trial to Pietras' qualifications, expertise or opinions. Nor does it lend any weight to his argument. It was unprofessional and ill-advised.

5

There are different ways to join a gang, including being "jumped in," i.e., beaten by other members, "crimed in" by committing crimes with associates, or being "walked in," based on legacy family ties to the gang. Significantly, gang members do not commit crimes with non-members, and they only commit crimes with fellow gang members with whom they have established trust.

Guns are highly sought by gang members because they are relatively difficult to obtain. Members know if one of them has a gun because the armed member is expected to confront rivals and "take care of business" as necessary. Knowing who is armed also allows the unarmed members to distract police while the armed one makes his escape with the gun. When a gang member uses a gun, he shoots to kill because a killing both increases the shooter's level of respect in the gang and maximizes the fear it inspires.

Turning to the instant case, Pietras opined the shooting here was gang-related. He based this on the fact JD1 and JD2 were walking in Anaheim Travelers City territory and were hit up by at least one individual in the passing SUV. The SUV occupants continued to the 7-Eleven, parked, went in and stood behind and watched JD1 as he used an ATM to withdraw cash. They did not buy anything at the store and instead appeared to be simply watching JD1 and JD2. Once outside, two of them — appellant and Alcaraz — confronted JD1 and JD2. One claimed Anaheim Travelers City and said, "We don't fuck around," while the other demanded money from JD1, who had just been using the ATM. When JD1 refused and fought back, he was shot and hit twice, and appellant and Alcaraz fled to the awaiting SUV containing the other two gang members.

Furthermore, in Pietras' opinion, Alcaraz was an active participant in Anaheim Travelers City at the time of the shooting. He based this on Alcaraz's past contacts with police, his "Los Malos" tattoos, and his behavior in this case. Similarly, Pietras opined appellant was also an active participant in Anaheim Travelers City at the time of the shooting. This too was based on appellant's prior contacts with police in the

6

gang's territory and the facts of the instant case, including that he had claimed Anaheim Travelers City when JD1 was accosted. Pietras also found it significant appellant had earlier warned a coworker about needing a "pass" to walk through a particular neighborhood, which is something a gang member would do to assert and maintain control of territory. And, appellant said his father was an Anaheim Travelers City member, suggesting he had been admitted into the gang based on his legacy status.

Pietras opined SUV driver Manzo was also an Anaheim Travelers City member at the time of the shooting. He based this on Manzo's role in this case and the fact Manzo sported tattoos of "Anaheim TC" and "LM" on his back. Moreover, Manzo had earlier pleaded guilty to a different attempted robbery charge with a gang enhancement.

Finally, when presented with a hypothetical scenario based on the facts of this case, Pietras' expert opinion was the resultant charged crimes would have been committed for the benefit of, in association with, or at the direction of a criminal street gang. He explained it would benefit the gang because its members were attempting to commit a robbery in their own territory, they were hitting up suspected rivals, and they severely punished a disrespectful person by shooting and attempting to kill him. The shooting would additionally demonstrate and promote the gang's dominance in its territory.

*Appellant's Defense Case*

A registered nurse from the surgery department of the UCI Medical Center testified she had known appellant for about five years when he was a coworker. She explained he was employed at the hospital as a helper who would clean up the operating rooms and assist the nurses. She said he was an excellent worker, and she was shocked when she heard he had been arrested. She had never seen him angry before and believed him to be soft-spoken. She thought appellant's friends took advantage of him for money, and she had spoken to him about that. She knew he came from a tough neighborhood but

7

did not believe his friends were gang members. She admitted she did not know appellant outside of work and did not socialize with him outside of work. She had never been to the neighborhood where he lived and never met his friends. Appellant did not testify.

*Alcaraz's Defense Case*

Alcaraz recalled JD1, who admitted posting several apparently gang-related messages on social media, including: "Momma raised a G but not no fool," where "G" meant "gangster." "It's do or die on these streets so I pack my gun. I'd rather get caught with it than caught without one. If you step out of line, you getting smashed up quick. You don't want to test me on this murderous tip." In another post, JD1 said he wanted to get a tattoo of "SS" on his chest, apparently a reference to "South Side." He insisted "SS" did not refer to the street gang "South Side Krooks," but was a generic reference to southern California. He had also once posted, "Krookin' on this gloomy day," and had appeared in a photo with several other men, including his brother, some of whom were members of the South Side Krooks. JD1 admitted he owned a jacket with the number "13" on it, supposedly a reference to the Mexican Mafia.

JD1 maintained he was not a gang member. He admitted one of his brothers was a South Side Krooks member, his father was a member of "Santa Nita," a street gang based in Santa Ana, and some of his friends were gang members. He explained that even though he had grown up in a gang neighborhood, and in a "gang culture household," he had consciously decided he did not want to become a gang member.

Another post showed JD1 holding a gun. JD1 admitted he owned a rifle and a handgun, and that his father also owned guns. He said he was long interested in firearms, had always wanted to become a marine, and all his weapons were registered. On the night he was shot, he was unarmed.

Alcaraz also recalled Pietras, who explained "South Side 13" is not a reference to any specific local street gang, and instead is a generic reference to southern

8

California. He said if a person were to write he was "krookin," it could suggest he was a South Side Krooks gang member. However, in Pietras' investigation of JD1 in preparation for the trial, he found no indication JD1 was ever in a gang. Similarly, even after listening to JD1's testimony during the trial, including his testimony in the defense case regarding his social media posts, Pietras still did not believe JD1 was a gang member.

When presented with a hypothetical situation like the initial hit-up in this case, and assuming the person being challenged was a South Side Krooks member, Pietras agreed a violent encounter would likely occur, but stated it would have occurred during the hit-up, and not later during the attempted robbery. He said South Side Krooks was a small gang, but it was allied with "Anaheim Vatos Locos," which is a rival of Anaheim Travelers City. Alcaraz did not testify.

*Prosecution Rebuttal*

In response to the nurse's testimony, Kevin S., another of appellant's coworkers at UCI Medical Center, was recalled by the prosecutor.[4] He testified he believed appellant was a "great guy" at work, but outside of work he was involved in gang activities. Kevin S. and other coworkers had tried to make appellant understand he had a good job with a potential for a good future if he did not squander it by continuing to be involved with gangs.

*Verdict and Sentencing*

The jury convicted appellant and Alcaraz of premeditated and deliberate attempted murder (§§ 664, 187), attempted robbery (§§ 664, 211), conspiracy to commit robbery (§§ 182, subd. (a)(1), 211) and active participation in a criminal street gang (§ 186.22, subd. (a)). The jury found the first three crimes were committed for the benefit

---

4      Kevin S. earlier testified appellant told him that people "don't take too kindly" to his walking his dog in a certain location. He told Kevin S. he had spoken to his "homeboys," and they would give him a "pass" to enter the neighborhood but warned him to be careful.

9

of, at the direction of, and in association with a criminal street gang. (§ 186.22, subd. (b).) On the attempted murder and attempted robbery charges, the jury found Alcaraz personally discharged a firearm causing great bodily injury and permanent paralysis. (§§ 12022.53, subd. (d), 12022.7, subd. (b).) On the conspiracy charge, the jury also found Alcaraz used a firearm and caused permanent paralysis. (§§ 12022.5, subd. (a), 12022.7, subd. (b).) On the attempted murder and attempted robbery charges, the jury found appellant vicariously liable for Alcaraz's gang-related firearm use. (§ 12022.53, subds. (d) & (e)(1).) Both defendants were sentenced to lengthy indeterminate life terms, plus additional determinate sentences.

## DISCUSSION

### *The Jury Bias Claim*

Appellant contends his convictions must be reversed because he was denied a fair trial due to alleged jury intimidation from the audience during trial and the trial court's failure to adequately investigate that intimidation. We are not persuaded.

After Thursday closing arguments, the trial was recessed until the following Monday, when the jury was to be instructed and begin deliberations. Before the trial resumed, however, Juror No. 155 came to court early asking to be excused from the jury. The trial court, the prosecutor, and both defense counsel retired to the jury room for a conference with the juror regarding her request.

Juror No. 155 disclosed for the first time she had been the victim of violent crime in the past, including two "mugg[ings]," and was now afraid of becoming a victim again. She feared JD1's and defendants' families would retaliate against her based on the outcome of trial, and she did not want to suffer the stress of that possibility. She was "not sure" what the "mindset" of "both parties' families" might be after a verdict. The court asked whether she could be impartial and render a fair verdict based on the evidence and instructions if she were required to remain. She said she could not, claiming to have "clouded judgment" based on her fear.

10

Appellant's attorney asked whether there was a particular person or event that had triggered her fears. She replied that because "this is gang-related on both sides . . . no matter which way it goes, one party is not going to be very happy," and she thought neither side would be fair to her after the trial. She felt "intimidated" by "both audiences." Appellant's attorney asked if she had discussed her fears with anyone other than her husband, such as with the other jurors. She said she had not.

Alcaraz's attorney asked her whether she thought "anyone else has these feelings. Has anyone else . . . mentioned it or said Oh, My God?" She insisted, "No. No. No." She added she had actually avoided conversing with the other jurors. She had only made one comment to another juror, asking her whether she had "noticed eyes on you." However, this unidentified juror did not respond. She was also disturbed because her fellow jurors had learned her name, saying "I'm not sure everybody [on the jury] is on the same page as far as how I feel about confidentiality."

The prosecutor directly asked her whether appellant's family, Alcaraz's family, or JD1's family had said or done anything specific that had intimidated her. She cryptically responded, "I think those who tried to intimidate know that they themselves know, I think, so they know that they're doing it. And — and I don't want to point anybody out."

Juror No. 155 returned to the courtroom where her husband was waiting, and the court met with counsel to determine how best to proceed. The court observed she appeared quite distraught. The court also revealed she had called the court after the trial had recessed on Thursday and said she did not want to come in at all on Monday unless she could come in early, before any audience members were present.

The court explained: "[T]here are three options. One is to keep the juror on the jury. The other one is to excuse her. And the third one of course is to ask more questions." Appellant's counsel said, "I wish we were keeping her," but he observed she "wasn't forthright with us" during voir dire by neglecting to mention that she had twice

11

before been mugged. Had she revealed she had been a crime victim, he likely would have exercised a peremptory challenge. He thought her comments suggested she could not be fair and would not constructively participate in deliberations. He therefore had no objection to dismissing her from the jury. Alcaraz's counsel agreed, noting she was likely prejudiced against both defendants. The prosecutor also agreed to her dismissal based on her statement she would not be able to follow the law or be fair.

The court concluded she should be excused because she was so fearful and "immensely distracted," and because she had withheld information during voir dire about being a crime victim. In addition, she said she could not work with her fellow jurors and render a verdict in accordance with the evidence and the instructions. She had also refused the court's suggestions of possible ameliorative steps, so the court concluded it would dismiss her. This conference lasted about 40 minutes, after which Juror No. 155 was excused and an alternate placed in her seat. The newly-constituted jury then heard instructions, deliberated, and returned their verdicts. Neither defense counsel asked for additional inquiry of the other jurors.

Appellant does not challenge the removal of Juror No. 155. Instead, he asserts the court erred by not conducting inquiry into whether the intimidation she said she perceived might have also affected the other jurors. We disagree.

A criminal defendant has a constitutional right to trial by an impartial jury. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; *In re Hitchings* (1993) 6 Cal.4th 97, 110.) "'An impartial jury is one in which no member has been improperly influenced [citations] and every member is "'capable and willing to decide the case solely on the evidence before it'" [citations].' [Citations.]" (*People v. Harris* (2008) 43 Cal.4th 1269, 1303.)

"In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial. . . ." (*Remmer v. United*

12

*States* (1954) 347 U.S. 227, 229 (*Remmer*).) "The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." (*Ibid.*; see *People v. Danks* (2004) 32 Ca1.4th 269, 302.) Thus, we apply a rebuttable presumption of prejudice whenever a nonjuror has "tampering contact or communication with a sitting juror. . . ." (*In re Hamilton* (1999) 20 Ca1.4th 273, 295 (*Hamilton*).)

"Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no substantial likelihood that one or more jurors were actually biased against the defendant. [Citations.] [¶] The standard is a pragmatic one, mindful of the 'day-to-day realities of courtroom life' [citation] and of society's strong competing interest in the stability of criminal verdicts [citations]." (*Hamilton, supra*, 20 Ca1.4th at p. 296.) The substantial likelihood test is an objective standard (*ibid.*) and is consistent with federal law. (*People v. Loker* (2008) 44 Ca1.4th 691, 747.)

Moreover, *Remmer* does "not stand for the proposition that any time evidence of juror bias comes to light, due process requires the trial court to question the jurors alleged to have bias." (*Tracey v. Palmateer* (9th Cir. 2003) 341 F.3d 1037, 1044.) Instead, *Remmer* has been construed as "providing a flexible rule." (*Ibid.*) Thus, a full "evidentiary hearing is not mandated every time there is an allegation of jury misconduct or bias. [Citation.] Rather, in determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source." (*United States v. Angulo* (9th Cir. 1993) 4 F.3d 843, 847.)

Significantly, unlike this case, the alleged juror bias in *Remmer* was not discovered until after the verdict; there the affected juror sat on the jury, deliberated, and returned a verdict. (*Remmer, supra*, 347 U.S. at p. 228.) In that context, the high court

13

concluded the trial court erred by ruling ex parte on whether there was juror misconduct without first notifying the defendant. And its remand was limited to ordering a trial court hearing in which all interested parties would be permitted to participate. (*Id*. at p. 230.) *Remmer* is therefore only marginally applicable to the case before us.

Appellant does not complain he was excluded from a hearing on Juror No. 155's bias; indeed, there was a hearing, and all counsel fully participated. Juror No. 155 was excused before jury instructions, deliberations, and verdict, and took no part in the deliberative phase of the trial. More importantly, there is no evidence any of the other jurors were affected by, or even aware of, what Juror No. 155 stated she experienced. Nor does the record show Juror No. 155 communicated her fears to any other jurors, and she denied as much. If anything, the record shows she had isolated herself from the other jurors and was even fearful of their attempts to become acquainted with her.

"[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." (*Smith v. Phillips* (1982) 455 U.S. 209, 217.)

Moreover, "[t]he decision whether to investigate the possibility of juror bias, incompetence, or misconduct — like the ultimate decision to retain or discharge a juror — rests within the sound discretion of the trial court. [Citation.] The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial." (*People v. Ray* (1996) 13 Ca1.4th 313, 343.) "The specific procedures to follow in investigating an allegation of juror misconduct are

14

generally a matter for the trial court's discretion.  [Citation.]"  (*People v. Seaton* (2001) 26 Cal.4th 598, 676.)  Here, the court reasonably concluded that once it had found that Juror No. 155 did not communicate her perceived fears to other jurors, there was no need to question the remaining jurors.  This decision was well within the court's discretion.

Instructive here is *People v. Fuiava* (2012) 53 Cal.4th 622 (*Fuiava*), in which a very upset juror telephoned the trial court one morning because she "had observed two female spectators in the courtroom who she believed were 'aligned' with the defense, apparently talking about the jurors and pointing at several of them.  Although [the juror] did not perceive the pointing as intended to threaten the jurors, the incident concerned her.  The trial court confirmed with [the juror] that no one had approached her or said anything to her.  [She] stated, however, that as the jurors were walking through the parking lot on their way home the previous evening, 'some of the jurors talked about this,' and [another juror] suggested that 'perhaps a note should be sent to the court.'"  (*Id.* at p. 701.)  The trial court thought the juror should be excused but was open to suggestions from the parties regarding what additional action should be taken, if any.  And just as here, counsel did not ask for the remaining jurors to be questioned and the trial resumed after the juror was replaced.  (*Ibid.*)

On appeal, the defendant claimed the trial court breached its duty to investigate whether other members of the jury had also been affected by the audience members' alleged conduct.  Noting that "'not every incident involving a juror's conduct requires or warrants further investigation,'" the *Fuiava* court held:  "The trial court did not abuse its discretion . . . by taking a 'wait and see' approach concerning whether any juror other than [the first juror] might have been affected by any actions of the courtroom spectators."  (*Fuiava, supra*, 53 Cal.4th at p. 702.)  There was no indication there — or here — that this had happened.

The Supreme Court emphasized the trial court had not itself observed any possibly inappropriate behavior by any spectators at the trial.  And "even assuming the

15

truth of what [the juror] had reported to the court — that two people associated with defendant had been talking and pointing at various jurors in a nonthreatening manner, and this had upset [the juror] — these circumstances did not suggest that other jurors were similarly upset to the extent that they, too, might not have been able to perform their duties as impartial jurors." (*Fuiava, supra*, 53 Ca1.4th at p. 702.) "There is no support for defendant's speculation that the other jurors were 'unsettled' by the gestures of the spectators, or, for that matter, that anyone other than [the juror] even saw the alleged gestures at issue." (*Id.* at pp. 702-703.) These observations apply equally here.

Similarly, defense counsels' "acquiescence in the trial court's decision regarding how to handle the situation, without an assertion of possible misconduct or a request for a hearing regarding the other jurors' ability to continue on the case, further supports our conclusion that a hearing was not warranted." (*Fuiava, supra*, 53 Ca1.4th at p. 703.) "In sum, it was reasonable for the trial court to proceed on the belief that any other juror who might have been affected by asserted spectator conduct would call that circumstance to the court's attention, rather than the court suspending the trial in the midst of closing arguments to undertake an inquiry on the subject." (*Ibid.*)

The Supreme Court concluded "there was no abuse of discretion in the trial court's decision not to conduct an inquiry of the remaining jurors. . . . [D]efendant has pointed to nothing in the record that would indicate any remaining juror actually was biased against defendant as a result of the [excluded] juror's having seen spectators talking and pointing at the jurors, such that we could conclude that there actually was good cause to remove a juror on that ground, or that any failure to excuse such a juror violated defendant's constitutional right to an impartial jury." (*Fuiava, supra*, 53 Ca1.4th at p. 703; see also *People v. Martinez* (2010) 47 Ca1.4th 911, 943 (*Martinez*) [a juror's inability to perform a juror's functions must be shown by the record to be a "demonstrable reality," and a reviewing court will not presume bias].) So too here.

16

Appellant attempts to distinguish *Fuiava*, arguing the court there "was dealing with nothing more than a sensitive juror. Here the trial court was perhaps dealing with a sensitive juror — but it was a sensitive juror who told the court she had been exposed to willful intimidation in the presence of other jurors." We are not convinced this is a distinction with a difference. The focus of our inquiry is not the legitimacy — or even the basis for — Juror No. 155's fears. Instead, it is whether there is any reason to believe the other jurors were "exposed to willful intimidation." And there is none.

Appellant also argues, "the situation in the courtroom here caused the bailiff to fear it would erupt in violence," unlike *Fuiava*, "where no improper conduct was observed in the courtroom." However, there is nothing showing that the bailiff's earlier unrelated safety concerns were related to the alleged intimidation Juror No. 155 said she had perceived when she asked to be excused.[5]

Here, the question is not whether tensions were high in the courtroom. This was a gang case involving rival gangs, where it appears family members of both the victim and the defendants, and perhaps fellow gang members, were all present. It is hard to imagine a gang-related trial like this where such tensions would not be present. Thus, it is likely bailiffs in any such courtroom would be concerned and make precautionary contingency plans for a possible outbreak of violence in the audience. The fact neither the trial court nor the attorneys said they perceived any unusual behavior in the courtroom supports this inference.

More importantly, the starting point of a reviewing court's inquiry is not whether "there is uncertainty in the record concerning what occurred because the trial

---

[5] The incident with the bailiff occurred 12 days before Juror No. 155's excusal. There, a different juror complained that members of JD1's family were "talking among one another and that it was distracting." Appellant's counsel told the court "the bailiffs were cautioning the defense . . . that there was some tension" in the audience, and a bailiff gave "a little briefing on how to handle things if things got out of hand . . . ." When the juror was asked to explain, she said some spectators had been "chattering" in the audience, which distracted her. The only statement she heard was someone asking, "Who's that?" when pictures were being shown on a courtroom screen. The court admonished the audience not to talk while court was in session or when jurors were present.

17

court did not conduct an inquiry," but "whether the information the trial court was aware of when it made its decision warranted further inquiry." (*Fuiava, supra*, 53 Ca1.4th at p. 703.) Our focus is whether any juror other than Juror No. 155 was intimidated by any audience conduct to such an extent he or she was biased, and there is no evidence of that. Juror No. 155's concern was alleged intimidation by unspecified audience members, not the presence of tension in the audience.

As noted, like the ultimate decision to retain or discharge a juror, whether and to what extent to investigate alleged juror bias is a discretionary determination by the trial court. (*Fuiava, supra*, 53 Ca1.4th at p. 702.) Appellant has not shown a "reasonable probability of prejudice, i.e., [a] substantial likelihood that one or more" of the twelve jurors who deliberated and returned verdicts here "were actually biased" against him. (*People v. Pettie* (2017) 16 Ca1.App.5th 23, 79; *Martinez, supra*, 47 Ca1.4th at p. 943, quoting *People v. Jablonski* (2006) 37 Ca1.4th 774, 807, quoting *People v. Holt* (1997) 15 Ca1.4th 619, 659 [bias "must be shown by the record to be a 'demonstrable reality,'" and a reviewing court will not presume bias].) Therefore, the trial court did not abuse its discretion in the manner in which it handled the juror bias issue.

*Premeditation Jury Instruction Claim*

Appellant next contends the trial court prejudicially erred by instructing the jury with the standard jury instruction's definition of "premeditation" as it related to the attempted murder charge.[6] He argues CALCRIM No. 601 does not correctly define premeditation because it "conflates the element of intentionally attempting to kill . . . with the concept of carefully weighing the choice to kill before acting." As a corollary, appellant further contends that, since his liability for the attempted murder is derivative of Alcaraz's under a natural and probable consequences theory, he could not be convicted of

---

[6] "The California jury instructions approved by the Judicial Council are the official instructions for use in the state of California." (Cal. Rules of Court, rule 2.1050, subd. (a).) The CALCRIMs are such instructions. (*People v. Lucas* (2014) 60 Ca1.4th 153, 294, disapproved on other grounds in *People v. Romero and Self* (2015) 62 Ca1.4th 1, 53, fn. 19.)

18

that crime here because the prosecution failed to prove Alcaraz harbored the requisite mental state. In other words, while appellant's own mental state is irrelevant to his culpability for the attempted murder, Alcaraz's is.[7] Assuming appellant's derivative liability syllogism is valid, we nonetheless reject his initial premise that CALCRIM No. 601 is flawed.

"The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law[.]" (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*Martinez, supra*, 47 Cal.4th at p. 953.) Even so, "instructions are not considered in isolation. Whether instructions are correct and adequate is determined by consideration of the entire charge to the jury." (*People v. Holt, supra*, 15 Cal.4th at p. 677; *Estelle v. McGuire* (1991) 502 U.S. 62, 72.) And even "[i]f the charge as a whole is ambiguous, the question is whether there is a '"reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' [Citations.]" (*Middleton v. McNeil* (2004) 541 U.S. 433, 437.) "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." (*People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258.)

Here the trial court instructed the jury with the standard form instruction CALCRIM No. 601: "If you find a defendant guilty of attempted murder. . ., you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully and with deliberation and premeditation. [¶] A defendant acted *willfully* if he intended to kill when he acted. A defendant *deliberated* if he

---

[7] See *People v. Favor* (2012) 54 Cal.4th 868 (*Favor*) [liability under natural and probable consequence doctrine only requires one of the perpetrators to act with the necessary mental state]; *People v. Lee* (2003) 31 Cal.4th 613, 616-617 [aider and abettor liability does not require personal willfulness, deliberation and premeditation by the aider and abettor].

19

carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. A defendant acted with *premeditation* if he decided to kill before completing the act of attempted murder. [¶] . . . [¶] The length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time. . . ."

Instructive here are the rules pertaining to a first degree murder prosecution. Like an attempt, "'[a] verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill.' [Citation.]" (*People v. Cage* (2015) 62 Cal.4th 256, 275 (*Cage*).) There, "'"[d]eliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance.' [Citation.]" (*People v. Brooks* (2017) 3 Cal.5th 1, 58; *Cage, supra*, 62 Cal.4th at p. 276.) In a murder case the jury is instructed with CALCRIM No. 521, which provides: "The defendant is guilty of first degree murder if the People have proved that (he/she) acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if (he/she) intended to kill. *The defendant acted deliberately if (he/she) carefully weighed the considerations for and against (his/her) choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if (he/she) decided to kill before completing the act[s] that caused death.*" (Second italics added.) Thus, CALCRIM No. 521's definitions of deliberation and premeditation for murder are almost identical to those in CALCRIM No. 601.

Put another way, appellant's criticism of CALCRIM 601's definition of premeditation for attempted murder equally applies to the standard instruction for murder

20

and, to accept his argument, we must find both standard instructions are similarly flawed. Appellant provides no authority supporting such a sweeping claim, and we have found no case that so suggests, let alone holds.

Appellant's focus on CALCRIM No. 601's definition of premeditation, without reading it with the concomitant definition of deliberation, overlooks the fact the crime is one of deliberate *and* premeditated attempt murder. The requisite mental state consists of both components, not one in isolation. (See *Favor, supra*, 54 Ca1.4th at p. 877, quoting *People v. Lee, supra*, 31 Ca1.4th at p. 616 ["the premeditation penalty provision of section 664(a) 'must be interpreted to require . . . the murder attempted was willful, deliberate, and premeditated . . . .'"].)

Appellant acknowledges the two terms must be read together, but still insists that, unlike CALJIC No. 8.20 (the predecessor to CALCRIM No. 521's murder instruction),[8] CALCRIM No. 601 is flawed because it confusingly "ties premeditation to the making the *decision* to kill before acting — improperly equating premeditation with rash decisions to kill as well as calculated decisions to kill." Thus, he contends CALCRIM No. 601 "can mislead the jury into focusing on the wrong aspect of the attempted murder — whether the aimed-for killing was intentional — rather than the actual relevant aspect — whether the attempted killing was the result of reflection." We disagree.

When CALCRIM No. 601 is read as a whole, its definitions of deliberation and premeditation properly require the jury to determine the attempted murder was the "result of reflection." It correctly tells the jury a "defendant *deliberated* if (he/she)

---

[8] Showing the interconnectedness of the terms, the current version of CALJIC No. 8.20 defines premeditation by reference to deliberation: "The word 'premeditated' relates to when a person thinks and means considered beforehand. One premeditates by deliberating before taking action." (CALJIC No. 8.20 (Fall 2008 Revision).) An earlier version of CALJIC No. 8.20 (5th ed. 1988), stated less circularly: "The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word 'premeditated' means considered beforehand." This version was held to be "a correct statement of law" in *People v. Perez* (1992) 2 Ca1.4th 1117, 1124.

21

carefully weighed the considerations for and against (his/her) choice and, knowing the consequences, decided to kill. . . . [And a] defendant acted with *premeditation* if (he/she) decided to kill before completing the act[s] of attempted murder."[9] (CALCRIM No. 601.)

Moreover, far from allowing the jury to "equat[e] premeditation with rash decisions to kill," the instruction specifically tells the jury that "[a] decision to kill made *rashly*, impulsively, or without careful consideration of the choice and its consequences is *not* deliberate and premeditated." (Italics added.) Consequently, CALCRIM No. 601 properly focuses the jury on the decision-making process, and not simply the defendant's intent to kill.

Although not a direct attack on the jury instruction, appellant further argues that because Alcaraz "did not shoot the victim until the victim punched him in the face," the evidence here actually points to a conclusion Alcaraz "acted rashly, in response to being punched, and did so without premeditation and deliberation." While better addressed to the jury than to us, this argument still suffers from the fact Alcaraz fired at least twice, and the temporal interval between shots was long enough for the second shot to strike the fleeing JD1 in the back. Indeed, JD2 testified he heard three or four gunshots before he saw JD1 get hit and fall down. (Cf. *People v. Silva* (2001) 25 Ca1.4th 345, 369 ["The manner of killing — multiple shotgun wounds inflicted on an unarmed and defenseless victim who posed no threat to defendant — is entirely consistent with a premeditated and deliberate murder"].) Even though the interval

---

[9] CALJIC No. 8.67 (Fall 2012 Rev.) also emphasized the necessity of reading the two terms together: "'Deliberate' relates to how a person thinks, and means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. [¶] 'Premeditated' relates to when a person thinks, and means considered beforehand. [¶] *A person premeditates by deliberating before taking action.* [¶] If you find that the attempted murder was preceded and accompanied by a clear, deliberate intent to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is attempt to commit willful, deliberate, and premeditated murder." (Italics added.)

between the shots may have been brief, that fact is not determinative. (Cf. *People v. Gomez* (2018) 6 Ca1.5th 243, 282, quoting *People v. Koontz, supra*, 27 Ca1.4th at p. 1080 ["'"The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly."'"].)

In the end, "[a] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." (*Boyde v. California* (1990) 494 U.S. 370, 378.) "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting." (*Id.* at pp. 380-381.)

Here, when the definitions of the terms are read in conjunction, and the instruction is read as a whole, CALCRIM No. 601 adequately instructed the jury on the interdependent meanings of "willful," "deliberation," and "premeditation." There was no instructional error. In light of this conclusion, it is unnecessary to reach the parties' additional arguments regarding prejudice.

### *Sufficiency of the Evidence Claim*

Appellant maintains his conspiracy and attempted robbery convictions must be reversed because they were not supported by sufficient evidence. Specifically, he contends, "There is no evidence in the record that [he] knew Alcaraz intended to rob [JD1] or intended to assist Alcaraz in the commission of that crime." Consequently, because his attempted murder conviction is predicated on it being a natural and probable consequence of the attempted robbery, his derivative liability for the attempted murder must also be reversed. Again, we are not convinced.

23

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one." (*People v. Smith* (2005) 37 Ca1.4th 733, 738.) We "evaluate the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Ramos* (2016) 244 Ca1.App.4th 99, 104; *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) If more than one inference may reasonably be drawn from the evidence, we accept the inference supporting the judgment. (*People v. Manibusan* (2013) 58 Ca1.4th 40, 87 (*Manibusan*).)

Similarly, even if there is contrary evidence, "[w]e resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" (*People v. Maury* (2003) 30 Ca1.4th 342, 403 (*Maury*).) It is the jury that weighs the evidence, assesses witness credibility, and resolves conflicts in the testimony. (*People v. Sanchez* (2003) 113 Ca1.App.4th 325, 330 (*Sanchez*).) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Ca1.4th 327, 357.) Simply put, an appellant "bears an enormous burden" to prevail on a sufficiency of the evidence claim. (*Sanchez, supra*, 113 Ca1.App.4th at p. 330.)

"Robbery is defined as 'the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.' [Citation.] Robbery requires the 'specific intent to permanently deprive' the victim of his or her property. [Citations.]" (*People v. Mora and Rangel* (2018) 5 Ca1.5th 442, 489 (*Mora and Rangel*).) "An attempted robbery requires a specific intent to commit robbery and a direct, ineffectual act (beyond mere preparation) toward its commission." (*People v. Medina* (2007) 41 Ca1.4th 685, 694 (*Medina*).) Moreover, for an attempted robbery, actual "commission of an element

24

of the crime [of robbery] is not necessary.  [Citation.]  As such, neither [is] a completed theft . . . ."  (*Ibid*.)  Thus, sufficient evidence can support an attempted robbery conviction where a defendant demands the victim's property at gunpoint, even when a shooting immediately occurs, and no property is subsequently taken.  (See *Mora and Rangel, supra*, 5 Cal.5th at pp. 489-490.)

A criminal conspiracy is defined as two or more persons agreeing to commit a crime.  (§ 182.)  A conviction for conspiracy requires proof the defendant agreed with another to commit an offense, had the specific intent to commit the offense, and there was at least one overt act by at least one of the coparticipants in furtherance of the conspiracy.  (*People v. Morante* (1999) 20 Cal.4th 403, 416-417 (*Morante*).)

Here there is no question Alcaraz attempted to rob JD1.  He pointed his gun at JD1 and demanded he "[g]ive me everything you have."  When JD1 put his hands up and said, "I don't have anything," Alcaraz patted JD1's pockets, felt his phone, and demanded JD1 hand it over.  Appellant does not deny there was an attempted robbery.  Instead, his claim is there was insufficient evidence he knew of Alcaraz's plan, shared an intent to rob JD1, and had agreed to rob JD1.

"'[E]vidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.'  [Citations.]"  (*Manibusan, supra*, 58 Cal.4th at p. 87.)  Thus, "'"[t]he standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.  [Citation.] . . . [citations].'"'"  (*People v. Ghobrial* (2018) 5 Cal.5th 250, 277.)  "Where the circumstances support the trier of fact's finding of guilt, an appellate court cannot reverse merely because it believes the evidence is reasonably reconciled with the defendant's innocence."  (*People v. Meza* (1995) 38 Cal.App.4th 1741, 1747.)

A person aids and abets a crime if he or she aids, promotes, encourages or instigates the commission of the crime, with knowledge of the perpetrator's unlawful

25

purpose and the intent to facilitate the commission of the crime. (*People v. Nguyen* (2015) 61 Ca1.4th 1015, 1054 (*Nguyen*).) "The actual perpetrator must have whatever mental state is required for each crime charged . . . . An aider and abettor, on the other hand, must 'act with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citation.]" (*People v. Mendoza* (1998) 18 Ca1.4th 1114, 1123.) "'Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment.' [Citation.]" (*People v. Campbell* (1994) 25 Ca1.App.4th 402, 409.)

Thus, to be guilty as an aider and abettor to an attempted robbery, a defendant must know of the perpetrator's intent to permanently deprive the victim of his or her property, intend that the perpetrator do so, and promote or encourage the crime in some way. In the closely related context, a defendant is guilty of a conspiracy to commit robbery when he or she agreed with another person to commit a robbery, had the specific intent to commit the offense, and there was an overt act committed by one of the coparticipants furthering the conspiracy. (*Morante, supra*, 20 Ca1.4th at pp. 416-417.)

"'Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact. . . . [¶] . . . [¶] Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' [Citation.]" (*Nguyen, supra*, 61 Ca1.4th at p. 1054.) All three are present here.

Appellant was present from the initial gang hit-up. He watched JD1 use the ATM to withdraw cash, followed JD1 and JD2 as they left the 7-Eleven, stood close beside Alcaraz as he attempted to rob JD1 and then shot him, fled with Alcaraz and met up with his fellow gang members to make good their escape. While it is true ""mere presence alone at the scene of the crime is not sufficient to make [him] a participant," his behavior "'may be [a] circumstance[ ] that can be considered by the jury with the other

26

evidence in passing on his guilt or innocence."' [Citation.]" (*Nguyen, supra*, 61 Ca1.4th at p. 1055.) These same facts demonstrate "companionship," and Pietras' testimony showed appellant, Alcaraz, and Manzo were all members of the same gang; a gang known to commit robberies as part of their primary activities.

Furthermore, Pietras' expertise established gang members typically work together in the commission of their crimes, back each other up, and do not commit crimes with non-members or others who they do not trust. Although "gang evidence standing alone cannot prove a defendant is an aider and abettor to a crime" (*Nguyen, supra*, 61 Cal.4th at p. 1055), Pietras' testimony did not stand alone. It strengthened inferences arising from the other evidence specific to appellant's role in the crimes. Finally, as to the conduct itself, the suspects worked together before and after the unsuccessful robbery attempt. From the hit-up to the conduct inside the 7- Eleven and the two-man confrontation; from the robbery attempt to the coordinated group SUV escape, the jury could reasonably have inferred the entire course of conduct evidenced a shared knowledge, planning, agreement, and intent to commit a robbery.

Specifically, "[m]indful of the standard of review on appeal for sufficiency of evidence questions [citation], we conclude that, although no direct evidence showed [appellant] acted with the required knowledge and purpose [to be an aider and abettor], there was substantial evidence from which a rational trier of fact could have found he in fact possessed such a mental state." (*People v. Hill* (1998) 17 Ca1.4th 800, 851.) The four suspects accosted JD1 and JD2 inside the 7-Eleven and all were aware JD1 had used the ATM. Appellant stood next to Alcaraz as they both confronted him and told JD1, "Travelers City. We don't fuck around." Alcaraz immediately pulled out his gun and demanded JD1's property. From these facts, the jury could reasonably infer appellant and Alcaraz were working together. "Certainly their behavior immediately prior to the crimes . . . suggests a preconceived plan of attack. We conclude the evidence of aiding and abetting was sufficient." (*Id*. at pp. 851-852.)

27

Appellant argues the evidence more strongly points to a theory he and his cohorts intended to commit an assault rather than a robbery. First, the two crimes are not mutually exclusive — robbery is most often accomplished by means of assault. (Cf. *Medina, supra*, 41 Cal.4th at p. 694 [robbery "combines elements of theft and assault"]; *People v. Sutton* (1973) 35 Cal.App.3d 264, 270 ["Robbery is a compound felony which includes all the elements of both theft and assault"].) Second, his argument the evidence could have supported a contrary finding regarding his knowledge and intent "misconstrue[s] and/or misappl[ies] the substantial evidence standard of review." (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1366, fn. omitted.)

Even if the evidence might support appellant's assault theory, we are not free to reform the verdict simply because another theory is plausible. (*People v. Jackson* (2016) 1 Cal.5th 269, 345, quoting *People v. Albillar* (2010) 51 Cal.4th 47, 60 ["'If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding"].) "Whether a reasonable trier of fact could reach a different conclusion based upon the same facts does not mean the verdict is not supported by sufficient evidence." (*Mora and Rangel, supra*, 5 Cal.5th at p. 490.)

The record here contains substantial evidence from which the jury could have found beyond a reasonable doubt that appellant knew of and shared Alcaraz's intent to rob JD1, and acted to further the robbery. (*Nguyen, supra*, 61 Cal.4th at p. 1056.) Similarly, this same evidence permits a reasonable inference he had agreed to support Alcaraz in the thwarted robbery, and that an overt act was committed in furtherance of that agreement. Appellant's convictions for conspiracy and attempt to commit robbery are amply supported. (*Ibid*.)

*Rebuttal Evidence Claim*

Appellant next contends his conviction for actively participating in a criminal street gang must be reversed because the trial court prejudicially erred by

28

permitting the prosecution to introduce evidence of his gang membership through the rebuttal testimony of his erstwhile coworker, Kevin S. Acknowledging his trial counsel did not object below, he alternatively claims his attorney was constitutionally ineffective for failing to object. We reject both claims.

The prosecutor proposed to recall Kevin S. to rebut the UCI nurse's testimony and testify he had heard that appellant once tried to start a fight with a motorist, had to dissuade his "homies" from stealing the car, and had admitted to Kevin S. he was a gang member. The prosecutor argued the evidence was admissible under Evidence Code section 1102 to rebut the character evidence appellant had presented in his defense case through the nurse's testimony.[10]

Appellant's counsel objected, arguing the proposed testimony involved multiple layers of hearsay. The court asked whether he would object if the prosecutor simply asked Kevin S. about appellant's "character for violence or truthfulness" or "trustworthiness." Defense counsel agreed that, if so limited, the testimony would be proper. However, he insisted that if Kevin S. attempted to "buttress" his opinion with any specific prior incidents, he would seek to call the individuals involved.

The court asked the prosecutor how appellant's prior acts of misconduct were admissible under Evidence Code section 1102. He replied they provided a non-hearsay foundation for Kevin S.'s opinion of appellant's reputation and character. The court was not convinced, and ruled Kevin S. would not be permitted to testify about any "specific instance of conduct which would clearly be hearsay. . . ." Nonetheless, Kevin S.'s opinion of appellant's reputation remained admissible: "[O]f course you are permitted to ask the witness . . . his opinion. Again, I think that kind of [Evidence Code § ] 1102 [evidence] works best with people who know somebody really well and recently

---

[10] "[E]vidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is [admissible] if such evidence is: [¶] (a) Offered by the defendant to prove his conduct in conformity with such character or trait of character. [¶] (b) Offered by the prosecution to rebut evidence adduced by the defendant . . . ." (Evid. Code, § 1102.)

29

because that opinion can matter even without specific instances of conduct to buttress it, but if you'd like, you can definitely do that." The court warned appellant's counsel that if his cross-examination delved too far into the basis for Kevin S.'s opinion, it might open the door to the prior instances of misconduct it had just excluded.

The prosecutor asked Kevin S. about appellant's reputation. He responded, "At work he was a great guy." When asked, "What about . . . your opinion of him outside of work?" he replied, "Outside of work I know he was involved in a gang, outside of work." Asked whether he had any other opinion, Kevin S. stated, "Just — it kind of hurt because a lot of us spent time talking with him and dealing with him at work trying to get him to straighten out, trying to get him to understand that he had a good job that could lead to a career with great benefits and why throw it away on something that doesn't matter in the end that would only hurt you." Appellant's counsel did not object to this testimony.

While appellant had succeeded in preventing the prosecutor from introducing his *admission* of gang membership to Kevin S., the elicited testimony did not violate that exclusion. Appellant's briefing mischaracterizes Kevin S.'s testimony, repeatedly criticizing the trial court and trial counsel for "allowing [Kevin S.] to testify [appellant] admitted he was involved in a gang." But that is not what Kevin S. said. Instead, when asked, "[W]hat's your opinion of [appellant] outside of work?" Kevin S. said, "Outside of work *I know he was involved in a gang . . . .*" (Italics added.) Kevin S. was not asked how he knew this to be true, and the jury was never told appellant had admitted gang involvement. Indeed, it appears trial counsel was careful not to ask Kevin S. how he obtained that knowledge, because of the trial court's earlier warning it could open the door to the much more damaging fact: appellant had admitted his gang involvement. Neither the prosecutor's questions, nor Kevin S.'s answers, violated the trial court's earlier ruling.

Because appellant placed his character and reputation into dispute through the nurse's testimony, the prosecutor was permitted to offer evidence to rebut appellant's reputation and character evidence. (Evid. Code, § 1102, subd. (b).) This underlying predicament for trial counsel also makes unpersuasive appellant's alternative argument his trial attorney's failure to object to Kevin S.'s rebuttal testimony constituted constitutionally ineffective assistance of counsel.

A claim of ineffectiveness of counsel comprises a two-pronged inquiry. First, appellant must show his counsel's performance fell below an objective standard of reasonableness. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) Second, he must also demonstrate prejudice, i.e., it is reasonably *probable*, not merely possible, "'"that, but for counsel's unprofessional errors, the result of the proceeding would have been different."'" [Citations.]" (*People v. Yates* (2018) 25 Cal.App.5th 474, 488.)

"'Surmounting *Strickland*'s high bar is never an easy task.' [Citation.]" (*Harrington v. Richter* (2011) 562 U.S. 86, 105 (*Richter*).) This is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. [Citation.]" (*Richter, supra*, 562 U.S. at p. 105.) "[W]e start with a presumption that [trial counsel] was conscious of his duties to his clients and that he sought conscientiously to discharge those duties. The burden of demonstrating the contrary is on his former clients." (*United States v. Cronic* (1984) 466 U.S. 648, 658, fn. 23.) Specifically, as to the prejudice prong, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' [Citation.]" (*Richter, supra*, 562 U.S. at p. 104.) Rather, "[t]he likelihood of a different result must be *substantial*, not just conceivable." (*Id.* at p. 112, italics added.)

31

Consequently, we review trial counsel's performance with considerable deference, indulging a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and recognizing the many choices that attorneys make in handling cases and the danger of second-guessing an attorney's decisions. (*Maury, supra*, 30 Cal.4th at p. 389.) Trial counsel is not ineffective for failing to make or pursue meritless objections. (*People v. Weaver* (2001) 26 Cal.4th 876, 931; *People v. McCutcheon* (1986) 187 Cal.App.3d 552, 558-559 ["Defense counsel need not make futile objections . . . merely to create a record impregnable to attack for claimed inadequacy of counsel"].) "The decision whether to object to the admission of evidence is 'inherently tactical,' and a failure to object will rarely reflect deficient performance by counsel." (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1335, abrogated on other grounds in *People v. Hardy* (2018) 5 Cal.5th 56, 100.) "Although trial counsel may have the duty to protect the record when their client's trial interests are truly at stake, they have no duty to object simply to generate appellate issues. Sometimes, the best action an attorney can take regarding an available objection is not to make it." (*People v. Riel* (2000) 22 Cal.4th 1153, 1202.)

"If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citations.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.) Rather, "[a] claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) This is such a case.

Appellant's trial counsel was faced with a decision whether he should introduce the nurse's positive character evidence supporting his client to counter the otherwise substantial evidence of his guilt. Appellant's identity and involvement in crimes resulting in a permanently-paralyzed victim were not in dispute. Counsel was

able to minimize the ramifications of the strategy he chose by successfully excluding his client's gang admissions and opened the door only slightly to Kevin S.'s limited rebuttal testimony. We cannot reasonably conclude trial counsel had no basis for the choices he made or for the strategy he used in defense of his client. Appellant has not shown his trial counsel's representation was constitutionally ineffective.

<em>SB 775 Claim</em>

That brings us to the one issue the Supreme Court granted review on and ordered us to reconsider: Is appellant entitled to have his conviction for attempted murder reversed in light of SB 775? As respondent concedes, the answer to that question is yes.

SB 775 was a follow-up measure to Senate Bill No. 1437 (Stats. 2018, ch. 1015) (SB 1437), which became effective on January 1, 2019. As relevant here, SB 1437 eliminated the natural and probable consequences theory of aiding and abetting for the crime of murder by providing that "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) SB 1437 also created a statutory procedure, codified in section 1170.95, by which defendants who have been convicted of murder based on the natural and probable consequences theory of aiding and abetting may petition for vacatur and resentencing if their conduct did not constitute murder as redefined by SB 1437. (See *People v. Lewis* (2021) 11 Cal.5th 952, 957.)

At the time we issued our original opinion in this case, there was a split of authority as to whether SB 1437 applied to defendants, like appellant, who were convicted of attempted murder. However, we did not have to wade into that fray because case law was unanimous that claims for SB 1437 relief were not cognizable on direct appeal from an underlying judgment; instead, they had to be addressed to the trial court in the first instance pursuant to the procedures set forth in section 1170.95. Accordingly, we denied appellant's SB 1437 claim without prejudice to him filing a section 1170.95 petition in the superior court.

33

However, not long after we issued our opinion, the Legislature enacted SB 775. That bill expanded the scope of section 1170.95 to include defendants who were convicted of attempted murder under the natural and probable consequences theory of aiding and abetting. (§ 1170.95, subd. (a).) In addition, SB 775 made it clear that anyone so convicted "may challenge on direct appeal the validity of that conviction based on the changes" ushered in by SB 1437. (*Id*., subd. (g).) In other words, a section 1170.95 petition is no longer required to obtain the benefits of that provision.

The Attorney General acknowledges as much. He also admits appellant is entitled to have his attempted murder conviction reversed due to the manner in which the jury was instructed with respect to that offense. In that regard, the record shows the jury was instructed on two theories of aiding and abetting liability. The first theory, which remains viable after SB 1437, permitted the jury to convict appellant of attempted murder if he directly aided and abetted Alcaraz in the commission of that offense. The second theory, which was abrogated by SB 1437, allowed a conviction for attempted murder if that offense was a natural and probable consequence of one or more of the lesser charged offenses that appellant and Alcaraz committed.

At appellant's trial, there was no direct evidence he intended to kill JD1 or knew Alcaraz was going to shoot him. Thus, it is hardly surprising the prosecutor relied heavily on the natural and probable consequences theory in arguing appellant was guilty of attempted murder. By doing so, the prosecutor avoided having to prove appellant harbored the intent to kill. Under these circumstances, the Attorney General concedes it is simply not possible to conclude beyond a reasonable doubt that the jury's guilty finding rested on the still-valid theory of direct aiding and abetting. Therefore, appellant's conviction for attempted murder cannot stand. (*People v. Chiu* (2014) 59 Cal.4th 155, 167; *People v. Sanchez* (2022) 75 Cal.App.5th 191.)

Appellant contends that conclusion dictates the case be remanded for a hearing pursuant to section 1170.95, subdivision (d)(3). But that provision only comes

34

into play when the defendant files a petition for resentencing under section 1170.95. Because appellant never filed such a petition and has instead successfully invoked SB 775 on direct appeal from his underlying judgement, the proper remedy is to reverse his conviction for attempted murder and remand the matter for further proceedings. (See *People v. Chiu, supra,* 59 Cal.4th at p. 168; *People v. Hola* (Apr. 11, 2022, C087459) __ Cal.App.5th __ [2022 WL 1078221].) On remand, the prosecution may elect to retry appellant for attempted murder on the still-valid theory of direct aiding and abetting, or it may forego that option, in which case appellant would be entitled to a new sentencing hearing. (*Ibid.*)

### New Claim Arising Under Assembly Bill No. 333

Lastly, appellant argues there is insufficient evidence to support the gang charges. The argument is based on Assembly Bill No. 333 (AB 333), which established greater proof requirements for gang crimes and enhancements. (See 2021-2022 Reg. Sess., Stats. 2021, ch. 699.) Appellant contends the evidence adduced at his trial failed to satisfy these new requirements, which became effective on January 1, 2022.

However, as the Attorney General rightly notes, the Supreme Court's transfer order references a single issue, that being appellant's entitlement to relief under SB 775. Generally, we do not consider issues that are outside the scope of a transfer order issued from a higher court. (See, e.g., *M. Restaurants, Inc. v. San Francisco Local Joint Exec. Bd. Culinary etc. Union* (1981) 124 Cal.App.3d 666, 671 ["We understand our jurisdiction upon retransfer to be limited to execution of the Supreme Court's direction"].)

Appellant contends it makes sense for us to consider his AB 333 claim because his case is currently before us as part of his direct appeal. But, as we explained in the previous section, the matter must be remanded for further proceedings with respect to the attempted murder charge. Judicial economy would best be served by allowing the

35

trial court to consider all of appellant's arguments in a single proceeding. Therefore, we decline his invitation to consider his AB 333 claim at this time.

DISPOSITION

Appellant's conviction for attempted murder is reversed and the matter is remanded for further proceedings consistent with the views expressed herein. In all other respects, the judgment is affirmed.

BEDSWORTH, J.

WE CONCUR:

O'LEARY, P. J.

GOETHALS, J.